The UNITED STATES

v.

ZENITH RADIO CORPORATION.

Customs Appeal No. 77–19.

United States Court of Customs and Patent Appeals.

July 28, 1977.

Barbara Allen Babcock, Asst. Atty. Gen., Washington, D.C., David M. Cohen, Chief, Customs Section, Velta A. Melnbrencis, New York City, for the United States.

Eugene L. Stewart, Frederick L. Ikenson, Stewart & Ikenson, Washington, D.C., Philip J. Curtis, Chicago, Ill., attys. of record, for appellee.

Rivkin, Sherman & Levy, New York City, attys. of record, for amicus curiae; Saul L. Sherman, Joseph S. Kaplan, Donald H. Rivkin, New York City, of counsel.

Before MARKEY, Chief Judge, and RICH, BALDWIN, LANE and MILLER, Judges.

MARKEY, Chief Judge.

■ Appeal by the United States from a judgment of the United States Customs Court, 78 Cust.Ct. ——, C.D. 4691, 430 F.Supp. 242 (1977), holding that remission of a Japanese commodity tax, on electronic products exported from Japan, constitutes a bounty or grant under § 303, Tariff Act of 1930, as amended, 19 U.S.C. § 1303 (Supp. V 1975), and granting summary judgment to Zenith Radio Corporation (Zenith). We reverse.

## Background

In 1970, Zenith petitioned the Commissioner of Customs,[1] alleging that bounties or grants were being bestowed upon the manufacture and export of certain products[2] from Japan. The Commissioner investigated and, on January 7, 1976, published a "Final Negative Countervailing Duty Determination," announcing that "no bounty or grant is being paid or bestowed, directly or indirectly, within the meaning of section 303." 41 Fed.Reg. 1298 (1976). Ze-

nith, pursuant to § 516(d), 19 U.S.C. § 1516(d) (Supp. V 1975), contested the determination in the United States Customs Court.

## The Japanese Tax

■ The Japanese Commodity Tax Law, Law No. 48 of 1962, as revised and insofar as it appears in the record, imposes a single-stage "commodity tax" upon a manufacturer's shipment of specified electronic products for consumption in Japan. The same products are exempt from the tax when shipped for export.[3] A tax paid on a shipment for home consumption is refunded if that shipment is later exported.[4] It is undisputed that the tax is internal, and that the application of the tax to internal shipments, while refusing to apply it to exports,[5] is the sole governmental action which was adjudged below to have created a countervailable bounty or grant.

## The Customs Court

Upon application by the United States, a three-judge panel was convened pursuant to § 108, Customs Court Act of 1970. 28 U.S.C. § 255 (1970). Both parties moved for summary judgment. Relying heavily upon *Downs v. United States*, 187 U.S. 496, 23 S.Ct. 222, 47 L.Ed. 275 (1903), the court held that remission of the Japanese Commodity Tax constituted a bounty or grant under § 303, as a matter of law.[6]

1. Although § 303 imposes the burden of making countervailing duty determinations upon the Secretary of the Treasury, regulations (19 CFR § 16.24(b) (1970), now 19 CFR § 159.47(b) (1976)), require communication with the Commissioner of Customs.

2. The products include: television receivers, radio receivers, radio-phonograph combinations, radio-television-phonograph combinations, radio/tape recorder combinations, tape players, record players and phonographs complete with amplifiers and speakers, tape recorders, and parts of television receivers: color television picture tubes, resistors, transformers (deflection components), and tuners for receivers with integrated circuits. 37 Fed.Reg. 10,087 (1972), as amended 37 Fed.Reg. 11,487 (1972).

3. Tax exemption is also accorded certain goods sold at home to educational and welfare institu-

tions, the National Museum, and other specified purchasers.

4. We employ "remission" to denote both tax exemption and tax refund, which are legally indistinct on this appeal.

5. A tax on American exports would be unconstitutional. U.S.Const. art. 1, § 9, cl. 5. *Fairbank v. United States*, 181 U.S. 283, 21 S.Ct. 648, 45 L.Ed. 862 (1901). Amicus cites the remission of state taxes upon shipments into other states of the United States. Neither consideration is applicable to a determination under § 303.

6. Judge Richardson wrote for the court. Judges Newman and Boe filed concurring opinions. The thorough treatment given the issues by the distinguished judges of the panel rests essentially upon an interpretation of *Downs* with which we differ.

Accordingly, the court granted Zenith's motion for summary judgment and ordered the Secretary of the Treasury to determine the net amounts of the bounties or grants and to assess countervailing duties equalling those amounts "on the subject electronic products exported from Japan, entered or withdrawn from warehouse for consumption on or after the day following the date of entry of this Order."

### The Issue

The dispositive issue is whether the mere remission of an excise [7] tax must, as a matter of law, be deemed a bounty or grant under 19 U.S.C. § 1303 (Supp. V 1975): [8]

§ 1303. Countervailing duties.

(a) Levy of countervailing duties.

(1) Whenever any country, dependency, colony, province, or other political subdivision of government, person, partnership, association, cartel, or corporation, shall pay or bestow, directly or indirectly, any bounty or grant upon the manufacture or production or export of any article or merchandise manufactured or produced in such country, dependency, colony, province, or other political subdivision of government, then upon the importation of such article or merchandise into the United States, whether the same shall be imported directly from the country of production or otherwise, and whether such article or merchandise is imported in the same condition as when exported from the country of production or has been changed in condition by remanufacture or otherwise, there shall be levied and paid, in all such cases, in addition to any duties otherwise imposed, a duty equal to the net amount of such bounty or grant, however the same be paid or bestowed.

### OPINION

#### Prior Cases

■ The rationale supporting the judgment below begins with the view that the applicable law is to be found in a paragraph from the 1903 Supreme Court opinion in *Downs, supra.*[9] Though the Customs Court remarked the presence of an elaborate certificates-plus-tax remission scheme, it found primary support for its judgment in this paragraph (from which the court quoted the first and last sentences) in the lengthy *Downs* opinion:

The details of this elaborate procedure for the production, sale, taxation and exportation of Russian sugar are of much less importance than the two facts which appear clearly through this maze of regulations, viz.: that no sugar is permitted to be sold in Russia that does not pay an excise tax of R. 1.75 per pood, and that sugar exported pays no tax at all. The mere imposition of an import duty of three rubles per pood, paid upon foreign sugar, is, like all protective duties, a bounty, but is a bounty upon production and not upon exportation. When a tax is imposed upon all sugar produced, but is remitted upon all sugar exported, then, by whatever process, or in whatever manner, or under whatever name it is disguised, it is a bounty upon exportation. [187 U.S. at 515, 23 S.Ct. at 228.]

■ Opinions must be read in their entireties and in the light of the facts of the case. *Armour & Co. v. Wantock,* 323 U.S. 126, 133, 65 S.Ct. 165, 89 L.Ed. 118 (1944). Though the first and last sentences of the quoted paragraph, considered in vacuo,

---

7. The parties have described the tax as a "commodity," "consumption," and "excise" tax. For clarity, we employ "excise" throughout.

8. The United States contends on appeal that under § 516(g), 19 U.S.C. § 1516(g) (Supp. V 1975), the Customs Court exceeded its subject matter jurisdiction in ordering duties imposed prior to publication of the decision in the Customs Bulletin. We do not reach that issue.

9. Post *Downs*, the world has seen two World Wars, an industrial revolution, a scientific revolution, and flight from Kitty Hawk to the moon. Customs duties, though large, are not our sole source of government funds, as they virtually were prior to 1916. If, nonetheless, the Supreme Court had established the law in 1903, mere passage of years could not effect our decision, the duty of revising laws to fit a new world having been constitutionally assigned to the Congress.

would support the judgment below, their effect as binding precedent depends upon their relationship to the underlying facts and the remainder of the opinion in *Downs*. "It is a maxim, not to be disregarded, that general expressions, in every opinion, are to be taken in connection with the case in which those expressions are used." *Cohens v. Virginia*, 19 U.S. (6 Wheat.) 264, 398, 5 L.Ed. 257 (1821).

The clearest complete explanation of the complex Russian sugar scheme in *Downs* appears in the Board of General Appraisers' opinion, *Downs v. United States*, 4 Treas. Dec. 405, 409–413, T.D. 22984 (1901). The excise tax and certificate elements of the scheme were there described as:

VI. That, upon the exportation of said sugar * * *, the Russian Government, * * * released said sugar from said tax of 1.75 rubles * * * by a refund * * * a cancellation of indebtedness, or otherwise.

VII. That, in addition to remitting said excise tax, the Government issued to the exporter a certificate certifying that he had exported * * * free sugar. That * * * such certificates * * * have a substantial market value * *.

VIII. That said certificates are sold to and used by sugar manufacturers or refiners, who are thereby enabled to transfer from their "free reserve or free surplus" to their "free sugar" an amount of sugar equal to the amount shown by said certificates to have been exported, which amount may then be sold for domestic consumption on paying the ordinary tax of 1.75 rubles per pood (to which free sugar is regularly subject). [4 Treas.Dec. at 411.]

The board recognized that the combination of (1) regular and additional tax rebates, and (2) export certificates, operated to confer a bounty on sugar exports:

It is manifest * * * that the exporter * * * receives a valuable bonus * * * and that this bonus accrues * * * upon the exportation * * *. The export certificates or vouchers * *

are only the legal evidence of this valuable privilege or grant conferred by the Government, without whose authority such transfers of sugar would be valueless and of no effect.

Our conclusion, therefore, is that a bounty or grant * * * has been paid or bestowed * * * so as to work a benefit or advantage * * * as follows:

First. * * * the Government remitted or refunded the excise tax * * or otherwise canceled the indebtedness of the sugar manufacturer, so that he was enabled to place his product upon the market free from the burden of either the regular or additional excise tax.

Second. The certificate * * * had a substantial market value, and was transferable, and operated as a premium, grant, bonus, or reward. [*Id.* at 413.]

The whole Russian scheme, involving import duties, remission of regular and additional excise taxes, export certificates, and sugar transfers, was before the board, which did not decide the matter piecemeal. Hence, the appellate courts were faced with a board decision resting not on either of two independent grounds, but on a single ground having at least two important elements, and there was no call in *Downs* for the board, the Fourth Circuit, or the Supreme Court to decide whether a nonexcessive remission of an excise tax constitutes a *per se* bounty or grant.

On appeal, the Fourth Circuit affirmed, *Downs v. United States*, 113 F. 144 (4th Cir. 1902), adopting the board opinion and focusing its own attention on the export certificates:

We reach the conclusion that the collector of the port of Baltimore, under the provisions of the fifth section of the tariff act of July 25, 1897, properly imposed the duty now complained of by the appellant. We find that the Russian exporter of sugar obtains from his government a certificate, solely because of such exportation, which is worth in the open markets of that country from 1 ruble and 25 kopecks to 1 ruble and 64 kopecks per

pood, or from 1.8 to 2.35 cents per pound. Therefore we hold that the government of Russia does secure to the exporter of that country, as the inevitable result of its action, a money reward or gratuity whenever he exports sugar from Russia, and we think it was from such indirect grants as this that the congress of the United States intended to protect the manufacturers of this country, by authorizing the secretary of the treasury to make all proper regulations for the assessment and collection of such additional duties as were imposed by the collector on the sugars imported by the appellant. [*Id.* at 145.]

After devoting over ten pages to the elaborate Russian scheme in *Downs*, the Supreme Court referred to the petitioner's position, 187 U.S. at 512, 23 S.Ct. at 227:

It is practically admitted in this case that a bounty equal to the value of these certificates is paid by the Russian government, and the main argument of the petitioner is addressed to the proposition that this bounty is paid, not upon exportation, but upon production.

The remainder of the paragraph initiated by that sentence explains at length how bounties upon exportation may operate as bounties upon production and vice-versa.[10] The Court then responded to Downs' argument that a Russian exporter received the same amount whether or not he exported:

But the fact that he receives the same amount, whether the goods are exported or sold at home, is not the proper test whether a bounty is paid upon exportation. If no bounty at all were paid all sugar, or at least all "free sugar," would pay the same tax, whether sold at home or exported abroad; and in this case the free sugar upon which the tax is remitted when exported would go abroad burdened with an excise tax of R. 1.75 per pood, which would prevent the manufacturer from selling it at such a price abroad as would enable him to realize a profit. The amount he receives for his export certifi-

cate, say, R. 1.25, is the exact amount of the bounty he receives upon exportation, and this enables him to sell at a profit in a foreign market. All manufacturers would prefer to sell at a profit in a foreign market. All manufacturers would prefer to sell at home if they could realize a greater price than by selling abroad, but if by being paid a drawback, or by a remission of taxes, they can find a profitable market in a foreign country, so much sugar as is not needed at home will be sent abroad. [187 U.S. at 514–515, 23 S.Ct. at 228.]

Earlier in its extended opinion, the Court discussed the conjunctive effect of the import tariff and excise tax exemption parts of the scheme:

If the additional bounty paid by Russia upon exported sugar were the result of a high protective tariff upon foreign sugar, and a further enhancement of prices by a limitation of the amount of free sugar put upon the market, we should regard the effect of such regulations as being simply a bounty upon production, although it might incidentally and remotely foster an increased exportation of sugar; *but where in addition to that* these regulations exempt sugar exported from excise taxation altogether, we think it clearly falls within the definition of an indirect bounty upon exportation. [Emphasis added. 187 U.S. at 513, 23 S.Ct. at 228.]

In the middle sentence of the paragraph containing the sentences quoted by the Customs Court, the Supreme Court reiterated its view that an import duty is a bounty upon production. Not without some confusion, the court thus bracketed its reference to import duty with comments that sugar sold in Russia was taxed and that exported was not and that a tax on "all sugar produced," but remitted on sugar exported, constituted a bounty upon exportation. The entire paragraph must be read as a whole, including its reference to import duty, and in the context of the entire opin-

---

**10.** The Tariff Act of 1922, ch. 356, § 303, 42 Stat. 935, broadened the countervailing duty law to include bounties or grants paid on manufacture and production.

ion, including the Court's earlier discussion of import duty, wherein it had found a bounty in the combination of import duty and excise tax remission. We cannot read the sentences quoted above as though they were divorced from all preceding and succeeding discussion, or as establishing a proposition of law to govern a fact (tax remission alone) not before the Court.

■ The Supreme Court not only considered the Russian scheme as a whole, but listed the actual price differences it created. The Court ended its opinion with the statement (re certificates) of the Fourth Circuit quoted above and stated, "We all concur with this expression of opinion." 187 U.S. at 516, 23 S.Ct. at 229. Thus the Court's *decision* was that the scheme bestowed a bounty. The Court did elect to insert in its *opinion* the broad language of the two sentences which served as foundation stones for the judgment now under review. That broad language was not necessary to the Supreme Court's decision and was not, therefore, its ratio decidendi.[11] When it is read, as it must be read, in light of the facts before the Court, that broad language did not constitute a Supreme Court holding that every nonexcessive remission of every

excise tax constitutes a bounty or grant as a matter of law.

We are mindful, as was the Customs Court, of subsequent references to broad statements in *Downs*. See e. g., *Nicholas & Co. v. United States*, 249 U.S. 34, 39 S.Ct. 218, 63 L.Ed. 461 (1919); *American Express Co. v. United States*, 67 Cust.Ct. 141, C.D. 4266, 332 F.Supp. 191 (1971), *aff'd on other ground*, 472 F.2d 1050, 60 CCPA 86, C.A.D. 1087 (1973); *F. W. Meyers & Co. v. United States*, 6 Treas.Dec. 260, T.D. 24306 (Bd. Gen.App.1903). Those references cannot, however, require us to disregard the facts in *Downs, Nicholas, American Express*, and *Meyers*.[12]

The Supreme Court has instructed us, *Kastigar v. United States*, 406 U.S. 441, 454–55, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972), that broad language unnecessary to the Court's decision in an 80-year-old case is not to be blindly accepted as binding authority, despite its having been quoted in many subsequent cases and even though the language had been described as stating the "principle" of the old case.

There being no prior instance in which any court has been presented with the question of whether, as a matter of law, the

**11.** The language has been described as dicta by some commentators, e. g., Butler, *Countervailing Duties and Export Subsidization: A Re-emerging Issue in International Trade*, 9 Va.J. Int'l L. 82 (1968–69); Feller, *Mutiny Against the Bounty: An Examination of Subsidies, Border Tax Adjustments, and the Resurgence of the Countervailing Duty Law*, 1 Law & Pol.Int'l Bus. 17 (1969); Note, *The Michelin Decision: A Possible New Direction for U.S. Countervailing Duty Law*, 6 Law & Pol.Int'l Bus. 237 (1974), and by this court, in referring to the Customs Court's reliance on *Downs* and *Nicholas*, infra, in *United States v. Hammond Lead Products, Inc.*, 440 F.2d 1024, 1030, 58 CCPA 129, 137, C.A.D. 1017 (1971), *cert. denied*, 404 U.S. 1005, 92 S.Ct. 565, 30 L.Ed.2d 558 (1971).

**12.** A review of the cited and researched cases establishes, as in *Downs*, that the bounty or grant in each case was found to reside in, and was measured by, an *excess* over the remission of excise taxes. Nor is that surprising in view of Treasury's practice, discussed infra. Thus, in *Franklin Sugar Refining v. United States*, 1 Ct.Cust.Appls. 242, T.D. 31276 (1911), a 2.50 mark "export bounty" was countervailed and a remitted 20 mark consumption tax was not. In

*Nicholas* a British scheme involved tax remission *and* an "allowance" of 3d and 5d per gallon for exported spirits. On appeal in *American Express*, supra, this court found it unnecessary to review the Customs Court's broad interpretation of *Downs* and *Nicholas* and looked to the many *hidden* taxes which were remitted in excess of any remitted excise tax. *United States v. Hills Bros. Co.*, 107 F. 107 (2d Cir. 1901) involved excess rebates on sugar exports. *F. W. Woolworth Co. v. United States*, 115 F.2d 348, 28 CCPA 239 (1940), involved a bounty created by currency manipulation. In *Marion R. Gray v. United States*, 70 Treas.Dec. 811, T.D. 48679 (1936), the Customs Court stated, " * * * at least a part of the *excess* of Great Britain's drawback paid to the manufacturer, constitutes a bounty or grant * * * under section 303 of the tariff act involved." [Emphasis added. *Id.* at 813]

*United States v. Passavant*, 169 U.S. 16, 18 S.Ct. 219, 42 L.Ed. 644 (1898), involved dutiable value, not countervailing duties. *F. W. Meyers*, supra, involved an export duty governed by para. 393, Tariff Act of 1897, not the remission of an excise tax.

remission of an excise tax, without more, bestows a countervailable bounty or grant, we confront a case of first impression.[13]

### The Statute

The intent of Congress, as expressed in § 303 itself, is not difficult to fathom. As the predecessor of this court, in *Nicholas & Co. v. United States*, 7 Ct.Cust. App. 97, T.D. 36426 (1916), and the Supreme Court in *Nicholas*, 249 U.S. at 39, 39 S.Ct. 218, indicated, the words "bounty" and "grant" are broad but not ambiguous. "Net amount" necessarily means that countervailing duties should equate to the true bounty or grant actually conferred. Congress' intent to provide a wide latitude, within which the Secretary of the Treasury (Secretary) may determine the existence or non-existence of a bounty or a grant, is clear from the statute itself, and from the congressional refusal to define the words "bounty," "grant," or "net amount," in the statute or anywhere else, for almost 80 years. As affects the present case, and consistent with that broad intent, Congress has not statutorily required that every governmental action distinguishing between products consumed at home and those exported shall be deemed the bestowing of a bounty or grant.

As this court's predecessor said in *Nicholas*, supra, 7 Ct.Cust.App. at 106: "It was a *result* Congress was seeking to equalize regardless of whatever name or in whatever manner or form or for whatever purpose it was done." On appeal in *Nicholas*, 249 U.S. at 39, 39 S.Ct. at 220, the Supreme Court said: "The statute was addressed to a condition and its words must be considered as intending to define it, and all of them—'grant' as well as 'bounty'—must be given effect."

Neither form nor nomenclature being decisive in determining whether a bounty or grant has been conferred, it is the economic result of the foreign government's action which controls. Thus, the language of § 303, "[w]henever any country * * * shall pay or bestow * * * any bounty or grant," requires a factual inquiry. The statute assigns that factual inquiry, in the first instance, to the Secretary. Courts may review a factual record upon which a determination has been based, but are woefully ill-equipped to undertake unaided the complex economic analyses required to determine whether a bounty or grant has in fact been conferred as a result of a particular governmental action. In the present case, the record is silent regarding the economic result of the mere remission of the Japanese Commodity Tax. The Secretary has presumably determined that the economic result here is not the conferring of such a benefit, subsidy, or incentive as would rise to the level of a bounty or grant under § 303.

The factual underpinnings of the Secretary's negative countervailing duty determination in this case are not under attack. On the contrary, the sole question on this appeal is whether the mere remission of the Japanese Commodity Tax must be deemed a bounty or grant as a matter of law. Nothing in the statute itself so requires.

### Legislative History

The imposition of countervailing duties, on imports other than sugar, was first provided for in § 5 of the Tariff Act of 1897, 30 Stat. 205. The parties agree that Congress repeatedly reenacted that basic provision without substantial change (§ 6 of the Tar-

---

**13.** Judicial review of negative countervailing duty determinations was not sought before 1971. Congress made it available to manufacturers, producers and wholesalers in 1975, § 516(d), Tariff Act of 1930, as amended, 19 U.S.C. § 1516(d) (Supp. V 1975), in response to this court's recognition of its nonavailability to those groups in *Hammond Lead*, supra note 11.

Congress did not, however, require hearings and preparation of a hearing record from which

it might be determined, on review, whether the Secretary's action was supported by substantial evidence or was arbitrary or capricious, in the manner practiced, for example, under the Administrative Procedure Act, 5 U.S.C. § 551 et seq. Nor have the regulations, 19 CFR 159.47, Part 175 (1976), prescribed under § 516(h), done so. Congress did require hearings, on request, in antidumping cases, 19 U.S.C. § 160(d) (Supp. V 1975).

iff Act of 1909, 36 Stat. 85; para. E of the Tariff Act of 1913, 38 Stat. 193; § 303 of the Tariff Act of 1922, 42 Stat. 935; § 303 of the Tariff Act of 1930, 46 Stat. 687; and as § 331(a) of the Trade Act of 1974, 19 U.S.C. § 1303 (Supp. V 1975)).

The United States says the absence of definitions for "bounty," "grant" and "net amount" creates ambiguity, requiring resort to legislative histories of the Tariff Acts of 1890, 1894, and 1897. Zenith, as did the Customs Court, cites the Supreme Court's indication in *Nicholas,* supra, that "bounty" and "grant" are not ambiguous. Both parties have supplied extensive reviews of legislative history in support of their respective positions.

Respecting the legislative history behind "bounty," "grant," and "net amount," we are convinced, after careful review of the cited floor statements, committee reports, submissions and testimony, and after full consideration of the conflicting inferences drawn therefrom by the parties, that Congresses since 1890 have elected to refrain from stating that any specific condition would constitute a bounty or grant effective to require imposition of countervailing duties under § 303,[14] and to refrain from specifying a method of calculating net amount. Certain it is that nothing in the voluminous citations of record indicates a congressional intent that countervailing duties must be imposed in response to a nonexcessive remission of an excise tax, the condition now before us.

Not without reason has Congress refrained from spelling out either the precise criteria for determining what shall constitute a bounty or grant and what shall not, or the calculations to be followed in determining net amount. As this court said in *Hammond Lead,* supra note 11: "In the assessment of a countervailing duty, the determination that a bounty or grant is paid necessarily involves judgments in the political, legislative or policy spheres," 440 F.2d at 1030, 58 CCPA at 137, to which the court might well have added the eminently important economic sphere. Our nation's relationships in the world family are particularly sensitive to the assessment of the additional duties known as "countervailing" duties. Such assessment is not just a means of protecting our producers, as Congress has recognized in refusing to require proof of injury before making such assessment; it is also one of the chips in a game played by governments on a world stage. Presumably enacting and reenacting § 303 in this broad light, illuminative of the statute's role in the world, Congress in its wisdom has simply refrained from calling all the countervailing duty plays in advance.[15]

Nothing, therefore, in § 303 itself, or in the cited and researched legislative history

14. The United States cites the exclusion of internal taxes remitted on exports from the cost of materials in determining constructed value, § 402(d), Tariff Act of 1930, as amended, 19 U.S.C. § 1401a(d), and the including of such remitted taxes in determining purchase price under § 203, Antidumping Act of 1921, 19 U.S.C. § 162 (Supp. V 1975), as indicating congressional evaluation of such remissions as neither unfair nor prohibitive. The point may be useful in urging consistency on the part of the Congress. It cannot, however, supply a congressional definition of "bounty," "grant" or "net amount" appearing in § 303.

15. Congress' most recent reference to the international implications of export incentives and countervailing duties, and to the role of the Executive in connection herewith, appears in § 331(a), Trade Act of 1974, 19 U.S.C. § 1303(d)(1) (Supp. V 1975):

It is the sense of the Congress that the President, to the extent practicable and consistent with United States interests, seek through negotiations the establishment of internationally agreed rules and procedures governing the use of subsidies (and other export incentives) and the application of countervailing duties.

To facilitate negotiations, Congress, while continuing to refrain from a definition of "bounty" or "grant," granted authority to the Secretary to suspend during the four years beginning January 3, 1975, and under certain conditions, the imposition of countervailing duties, after having determined that a bounty or grant is in fact being bestowed, 19 U.S.C. § 1303(d)(2), and to reinstate such duties, 19 U.S.C. § 1303(d)(3). In § 1303(e), Congress provided for reports to it of actions under § 1303(d)(2), and for the undoing thereof upon a resolution of disapproval by the Senate or the House.

relating to the terms "bounty," "grant," or "net amount," aids the decisional process in the present appeal.

### Congressional Ratification

The Customs Court considered the reenactments of § 5 of the 1897 Act as congressional ratification of the court's interpretation of *Downs.* We disagree.

The basis for the "ratification" view expressed below lies in a paragraph from a 1908 submission to the House Committee on Ways and Means:

> In *Downs ˙v. United States,* 187 U.S. 496 [,23 S.Ct. 222, 47 L.Ed.2d 275] (1903), it was held that the remission of the excise tax imposed on sugar sold in Russia granted to the exporter of sugar, which remission is awarded in the form of a certificate having a substantial market value, and the subject of purchase and sale, is equivalent to a bounty, and such sugar when imported into the United States is subject to an additional duty equal to the amount of such bounty.[16]

An assumption that Congress had the quoted paragraph in mind, when it acted in 1909, would not warrant the further assumption that it thereby ratified a holding that excise tax remission alone is a bounty. The author of the submission said the tax remission was "in the form of a certificate having a substantial market value." We shall never know whether he interpreted *Downs* as merging remission and certificate elements of the Russian scheme or whether he considered the saleable certificates alone an excessive remission. We know only that a committee was told that the Court had held excise tax remission "in the form of" saleable certificates equivalent to a bounty.

Moreover, if Congress must be assumed to have been informed of *Downs* in 1908, it must be equally assumed to have been better informed over the last half-century. In 1916, Congress established the Tariff Commission. 39 Stat. 796. In reporting to Congress in 1918, the Commission described *Downs*:

> The [Supreme] Court affirmed the decision of the Circuit Court of Appeals. The substance of the decision may be summarized as follows: "When a tax is imposed on all sugar produced but is remitted upon all sugar exported," *and* the exporter obtains from his government, "solely because of such exportation," a certificate which possesses an actual value and is saleable in the open market, the remission of the tax is in effect a bounty upon the exportation. [Emphasis added.][17]

Thus, Congress was advised in 1918 that the bounty in *Downs* involved more than tax remission, and the Commission's report tends to defeat the notion that Congress, in reenacting § 303, intended to require the imposition of countervailing duties in response to tax remission alone.

In all events, the applicable statute is § 331(a) of the Trade Act of 1974, 88 Stat. 2049 (amending § 303 of the Tariff Act of 1930), 19 U.S.C. § 1303, and rusted segments of legislative history, generated in other times, under other conditions, may be of limited value when recent segments, touching more current questions are available. As will be seen, the cognizant committees of the 93rd Congress did refer, albeit ambivalently, to the Treasury Department's interpretation of § 303 and its long-standing practice under that interpretation.

### Administrative Practice

Since 1898, the Treasury Department has consistently and uniformly interpreted § 303 as requiring that there be an "excessive" remission of an excise tax, i. e., the governmental giving of something above and beyond mere excise tax remission, to have a bounty or grant.[18] Conversely, it

---

**16.** *Notes on Tariff Revision* (1908). The quoted paragraph appears on page 834 of the 953 page document. The portions on court interpretation were prepared by an assistant counsel of the Treasury.

**17.** United States Tariff Commission, *Reciprocity and Commercial Treaties,* 434 (1919) (available, Department of State Library).

**18.** See 1 Treas.Dec. 696, T.D. 19321 (1898); 2 Treas.Dec. 157, T.D. 19729 (1898); 2 Treas.Dec.

has consistently and uniformly, for now almost 79 years, interpreted §· 303 as not requiring that the mere remission of an excise tax, i. e., a "nonexcessive" remission of the type now before us, be deemed a bounty or grant.[19]

 A long-continued, uniform administrative practice, if not contrary to or inconsistent with law, is entitled to great weight, *Saxbe v. Bustos*, 419 U.S. 65, 95 S.Ct. 272, 42 L.Ed.2d 231 (1976), particularly where, as here, those charged with its administration adopted that practice contemporaneously with the inception of the statute, *Power Reactor Development Co. v. International Union of Electrical Workers*, 367 U.S. 396, 81 S.Ct. 1529, 6 L.Ed.2d 924 (1961), and when Congress has repeatedly reenacted the statute without change,[20] *Saxbe*, supra; *Massachusetts Mutual Life Insurance Co. v. United States*, 288 U.S. 269, 273, 53 S.Ct. 337, 77 L.Ed. 739 (1933); *Komada v. United States*, 215 U.S. 392, 30 S.Ct. 136, 54 L.Ed. 249 (1910); *C. J. Tower*

& *Sons v. United States*, 44 CCPA 41, 44 C.A.D. 634 (1957); *United States v. Lawrence*, 11 Ct.Cust.App. 203, 208, T.D. 38967 (1921), and when Congress has failed to revise the statute in the face of such administrative practice, *United States v. Midwest Oil Co.*, 236 U.S. 459, 35 S.Ct. 309, 59 L.Ed. 673 (1915), and when Congress has refused requests to legislate a change, *United States v. Bergh*, 352 U.S. 40, 46, 77 S.Ct. 106, 1 L.Ed.2d 102 (1956); *Alstate Construction Co. v. Durkin*, 345 U.S. 13, 73 S.Ct. 565, 97 L.Ed. 745 (1953). Moreover, to sustain an administrative interpretation of a statute, a court "need not find that its construction is the only reasonable one, or even that it is the result we would have reached had the question arisen in the first instance in judicial proceedings." *Unemployment Compensation Commissioner v. Aragon*, 329 U.S. 143, 153, 67 S.Ct. 245, 250, 91 L.Ed. 136 (1946). Under the Internal Revenue Code, "Treasury regulations and interpretations

996, T.D. 20407 (1898); 26 Treas.Dec. 825, T.D. 34466 (1914); 54 Treas.Dec. 101, T.D. 42895 (1928); 56 Treas.Dec. 342, T.D. 43634 (1929); 73 Treas.Dec. 107, T.D. 49355 (1938). See also, the countervailing duty cases in note 12, supra.

**19.** Treasury's administrative practice and some of its rationale was described to Congress in *Executive Branch GATT Studies*, S.Comm. on Finance, 93d Cong., 2d Sess. 11–12 (1974):

Under administrative precedents dating back to 1897, the Treasury Department has generally not construed the rebate, remission or exemption on exports of ordinary indirect taxes (consumption taxes on goods) to be a "bounty or grant" within the meaning of our countervailing duty statute * * * since exports are not consumed in the country of production, they should not be subject to consumption taxes in that country. * * * application of countervailing duties to the rebate of consumption taxes would have the effect of double taxation * * * the United States would * * * impose * * * Federal and state excise taxes and state and local sales taxes, but would also collect, through * * * countervailing duty, the indirect tax imposed by the exporting country on domestically consumed goods.

The Treasury Department has not applied these precedents to tax "rebates" in excess of taxes collected on the exported product. If, for example, the foreign exporter has paid $1 in excise taxes on a product he exports to the United States but receives a rebate of

$1.20 on exportation, under long-established administrative precedents of the Treasury Department the imported merchandise would be subject to a countervailing duty of $0.20.

The Treasury Department has historically assumed that an excise tax is part of the price paid by home consumers. On the present record, that must be assumed true of the Japanese Commodity Tax. Where the tax is "paid" by home consumers, its remission on exports has not been considered a bounty or grant because the remission does not increase the manufacturer's profit margin. In recent years, a dichotomy has grown among economists regarding the possible difference in result when all or part of the tax is either "forward-shifted" or "absorbed." See the commentaries listed supra note 11, and Rosendahl, *Border Tax Adjustments: Problems and Proposals*, 2 Law Pol.Int'l Bus. 85 (1970).

**20.** For example, in *Copper Queen Mining Co. v. Territorial Board of Equalization*, 206 U.S. 474, 479, 27 S.Ct. 695, 696, 51 L.Ed. 1143 (1907), the Court was faced with an 18-year-old administrative interpretation of the statute. Justice Holmes wrote: "[W]hen for a considerable time a statute notoriously has received a construction in practice from those whose duty it is to carry it out, and afterwards is reenacted in the same words, it may be presumed that the construction is satisfactory to the legislature, unless plainly erroneous, since otherwise naturally the words would have been changed."

long continued without substantial change applying to unamended or substantially reenacted statutes, are deemed to have received congressional approval and have the effect of law." *Helvering, Commissioner v. Winmill*, 305 U.S. 79, 83, 59 S.Ct. 45, 46, 83 L.Ed. 52 (1938).[21]

The Customs Court dismissed the effect of Treasury's administrative practice because it deemed that practice contrary to the law it had gleaned from *Downs*, and because it found a failure of Congress to codify the practice. As above indicated, there is no judicial precedent contrary to or even inconsistent with the Treasury practice. So too, our study of the applicable legislative history from 1890 to 1975 finds no congressional action contrary to or inconsistent with the administrative practice.

The record does reflect unrequited suggestions to Congress that it enact the Treasury practice. We cannot, however, join the Customs Court in inferring therefrom a rejection or disapproval. At the outset, we find it difficult to believe that Congress would harbor in its breast a disapproval of an administrative practice for almost 80 years, while remaining so supine or irresponsible as not to change it. The suggestions on which the Customs Court focused were not that Congress should legislate a new, unheard-of practice. Though the record shows the first specific notice to Congress in 1949,[22] we cannot assume that Congress had earlier reenacted the statute four times without ever informing itself of Treasury's practice. But whether awareness of the practice has continued for 79 or for 28 years, the inference of acquiescence from Congress' failure to act against the practice over the many years involved, and through many reenactments of the statute, overbalances any inference of rejection from failure to codify it.

In 1950, the Treasury proposed an amendment which would have codified its practice and required injury to domestic industry. Objections were raised only to the injury requirement.[23] Nonadoption of that amendment can hardly be taken as proof of Congress' disapproval of Treasury's practice. The failure to adopt may have been due to concern over the injury requirement, or to any number of reasons. We shall never know. We do know that the proposal fully informed Congress of Treasury's long-practiced interpretation and administration of § 303. Congress' failure to act or even speak against it reflected at least a then-current willingness to allow that administrative practice to continue unabated and unchanged.

In 1968, the Senate Committee on Finance was advised that Treasury considered § 303 inapplicable to nonexcessive remis-

---

**21.** The United States cites the reasonableness of its practice and numerous cases setting forth guidelines for judicial review of agency action under the Administrative Procedure Act. We are not, however, reviewing a record under that Act in this case. See, supra note 13.

The United States also argues that its long practice coincides with international agreements (e. g., the GATT) and with international practice, that international trade would become a shambles, and that trade wars would erupt, if the Secretary were now required to find that mere remissions of excise taxes bestowed bounties. Such arguments are irrelevant here. No agency practice may, for any reason, repeal a statute or overrule the courts. If the practice were in conflict with the statute, the intent of Congress, or judicial precedent, it could not stand, and such arguments would have to be directed to the Congress. If no conflict or inconsistency exists, the arguments are unnecessary.

**22.** *Extension of Reciprocal Trade Agreements Act, Hearings Before the Senate Comm. on Finance*, 81st Cong., 1st Sess., 1195–99 (1949) (memorandum).

**23.** See H.R. 8304, 81st Cong., 2d Sess. (1951) and *Hearings on H.R. 1535 Before the House Comm. on Ways and Means*, 82d Cong., 1st Sess., 2, 79 (1951). See *Hearings on H.R. 5505 Before the Senate Comm. on Finance*, 82d Cong., 2d Sess., 115, 124–125 (1952).

In 1951, the State Department advised the Senate Finance Committee of the administrative practice under § 303 and that an amendment specifically stating that practice would merely clarify the law and would effect no change in the practice followed since the original enactment in 1897. See *Hearings on H.R. 1612 Before the Senate Comm. on Finance*, 82nd Cong., 1st Sess., 1197 (1951).

sions of excise taxes.[24] Congress took no action at that time. In 1970, it requested a detailed study on the subject.[25]

In considering the proposed Trade Reform Act of 1973, which evolved into the Trade Act of 1974, the cognizant Committees of Congress were informed, not only of Treasury's long continued practice, *but of the very remission of the Japanese Commodity Tax and of Zenith's countervailing duty petition now before us.* At that time, also, an amendment defining "bounty or grant" as encompassing the remission of an excise tax, the relief sought here,[26] was recommended by a witness but was not adopted.[27]

The Congress did adopt, however, as § 321(b) of the Trade Act of 1974, the administration's proposed amendment to § 203, Antidumping Act of 1921, 19 U.S.C. § 162 (Supp. V 1975). The administration said the amendment would conform the standard in the Antidumping Act to the standard under the countervailing duty law. In recommending the amendment, the House Ways and Means Committee stated:
 * * * The amendment would conform the standard in the Antidumping Act to

the standard under the countervailing duty law, thereby harmonizing tax treatment under the two statutes. However, your committee, in recommending this amendment, does not express approval or disapproval of the standard employed by the Treasury Department in administering the countervailing duty law with regard to the treatment under that law of rebates or remissions of direct and indirect taxes.[28]

And the Senate Committee on Finance stated:
 * * * The standard in the proposed amendment parallels that standard employed by the Treasury Department under the countervailing duty law in determining whether tax rebates and remissions constitute bounties or grants. However the Committee, in recommending this amendment, does not express approval or disapproval of that Treasury practice.[29]

The effect of the Committees' mutually contradictory approve-disapprove statements is necessarily to leave untouched the status quo with respect to the administrative practice on countervailing duties.[30]

---

**24.** See 2 *Compendium of Papers on Legislative Oversight Review of U.S. Trade Policies,* Comm. on Finance, 90th Cong., 2nd Sess., 475–476, 568–569, 887–889, 918–919 (1968).

**25.** See S. Finance Comm. Rep. No. 91–1481 [to accompany H.R. 19550], 91st Cong., 2nd Sess. 284–285 (1970).

**26.** The growing tendency of those who fail in their objective before the Congress to thereafter submit the same plea to undermanned federal courts is one factor contributing to the current appellate flood, which threatens to drown justice in the thrashings of a litigious sea. See D. Horowitz, The Courts and Social Policy 4–16 (The Brookings Institution, 1977). Sadly, moreover, the crowd can jam the courthouse door against the more deserving and less-advantaged.

**27.** See *Hearings on H.R. 6767 Before the House Comm. on Ways and Means,* 93rd Cong., 1st Sess., 2169–2171, 2496–2500, 3097, 3292–3293, 3814–3815 (1973). The Senate Committee on Finance Subcommittee on International Trade was so advised in 1971. See *Hearings on World Trade and Investment Issues Before the Subcomm. on International Trade of the Senate Comm. on Finance,* 92d Cong., 1st Sess., 102,

109–111 (1971). Though Congress' current interest in governmental assistance to foreign manufacturers may be assumed to have been occasioned by falling shares of the American market for American manufacturers, an abrupt change in a long-standing practice may have been viewed as both counter-productive in a trading world of increasingly interdependent economies and as injurious to American consumers on whom the countervailing duty might fall in the form of increased prices. However that may be, it is sufficient to our present task that Congress did not make the requested change in Treasury's practice.

**28.** H.R.Rep.No.93–571, 93d Cong., 1st Sess., 69 (1973).

**29.** S.Rep.No.93–1298, 93d Cong., 2d Sess., 172 (1974), U.S.Code Cong. & Admin.News 1974, pp. 7186, 7309.

**30.** That the two key committees of the Congress, with Treasury's treatment of the Japanese Commodity Tax law and the fact of Zenith's objections before them, and with full investigative powers and resources available, could not either approve or disapprove the ad-

Finding no guidance in what the committees said, we look to what the Congress did.

The adopted amendment to the Antidumping Act provides that in determining "purchase price" of imports there shall be added to the price charged the importer:
[a] the amount of any taxes imposed in the country of exportation directly upon the exported merchandise or components thereof, which have been rebated, or which have not been collected, by reason of the exportation of the merchandise to the United States, but only to the extent that such taxes are added to or included in the price of such or similar merchandise when sold in the country of exportation; and [b] *plus* the amount of any taxes rebated or not collected, by reason of the exportation of the merchandise to the United States, *which rebate or noncollection has been determined by the Secretary to be a bounty or grant* within the meaning of section 303 of the Tariff Act of 1930. [Emphasis added. P.L. 93–618, § 321(b), 88 Stat. 2045 (amending 19 U.S.C. § 162 (1970)] [31]

In so doing, Congress signaled its continuing intent to let the administrative practice under § 303 stand unmolested. Having decreased the number of taxes added to the purchase price in (a), to the disadvantage of the exporting manufacturer, Congress than added to the price, in (b), the amount of taxes "rebated or not collected" *and* "determined by the Secretary" to be a bounty or grant. If Congress intended that all rebates or noncollections by reason of exportation be deemed bounties or grants, no room would have been left for Secretarial determination. In *American Express,* supra, we expressed the view that Congress required the Secretary to impose a countervailing duty when a bounty or grant has been bestowed, but left to the Secretary the determination of whether a bounty or grant had in fact been bestowed. Nothing has occurred since 1973 to require change in that view.[32]

*Summary*

■ Nothing in § 303, or in its legislative history, requires that the remission of an excise tax alone must be deemed a bounty or grant as a matter of law. Congress has, through many years and repeated reen-

---

ministrative practice on its merits, is a dramatic exemplification of the reasons why a court should avoid entry into that policy thicket. Under appropriate conditions, courts may, as we do here, hold that an administrative practice reflects a permissible interpretation of a statute, while neither approving or disapproving the merits of the practice. Approving or disapproving the wisdom, effectiveness, etc., of an agency practice is a function of the Congress, the shifting of which to the courts conflicts with the fundamental separation of powers doctrine.

31. The United States argues that the Japanese Commodity Tax would fall within (a), rendering (b) redundant if Congress intended remission of such a tax to constitute a bounty or grant. On the premise that the Japanese tax is "added to or included in the price of such or similar merchandise" when sold in Japan, see note 19, supra, the argument has merit. Whether Japanese manufacturers absorb or shift the Japanese Commodity Tax, however, is an economic issue not before us.

32. This court expressed the same view in *United States v. Hammond Lead,* 440 F.2d at 1027–28, 1031, 58 CCPA at 134–139. The prompt congressional provision of judicial review, su-

pra note 13, while remaining silent with respect to this court's description of the Secretarial function under the statute, further confirms Congress' acquiescence, in the Treasury's administrative practice.

We do not imply that the Secretary has carte blanche, or the right to be totally arbitrary or inconsistent in applying a long-standing practice. Whether the Secretary could, however, under appropriate conditions, change present practice and begin to deem excise tax remission alone a bounty or grant is not before us. The value and effect of administrative practice, and the Secretary's authority to change it, have acquired statutory recognition in the field of customs. Under 19 U.S.C. § 1315(d) (Supp. V 1975), a practice setting a particular duty, and found by the Secretary to have been uniform, can be changed to assess a higher duty, but only as to imports occurring at least 30 days after publication of the higher duty. In the Trade Act of 1974, Congress amended this section to exempt the assessment of countervailing duties from the 30 day delay provision and thus altered Treasury's practice. § 331(c), Tariff Act of 1974, 19 U.S.C. § 1315(d) (Supp. V 1975). See [1974] U.S.Code Cong. & Admin. News p. 7320.

actments of § 303, refrained from exercising its power to make such remission a bounty or grant as a matter of law. There is no judicial precedent requiring that under § 303 such remission must be deemed a bounty or grant. The remaining tool in the decision-making inventory—a long-continued administrative practice not inconsistent with law—rests on an interpretation of § 303 as not requiring that such remission be deemed a bounty or grant.

As the Supreme Court said in *Saxbe v. Bustos*, 419 U.S. at 74, 95 S.Ct. at 279:

> This longstanding administrative construction is entitled to great weight, particularly when, as here, Congress has revisited the Act and left the practice untouched. Such a history of administrative construction and congressional acquiescence may add a gloss or qualification to what is on its face unqualified statutory language.[33]

Paraphrasing what the Court later said in *Saxbe*, 419 U.S. at 79–80, 95 S.Ct. at 281, to fit our case:

> Second, if * * * [a nonexcessive remission of an excise tax alone is now to be deemed a bounty,] the Congress [or the Executive] must do it. The changes suggested implicate so many policies and raise so many problems of a political, economic, and social nature that it is fit that the Judiciary recuse itself. At times judges must legislate "interstitially" to resolve ambiguities in laws. But the problem of * * * [changing a 79 year administrative practice effecting world trade] is not "interstitial" or, as Mr. Justice Holmes once put it, "molecular." It is a massive or "molar" action for which the Judiciary is ill-equipped.

## Conclusion

■ Until lawfully changed, the administrative practice of the Treasury Department, in uniformly considering a nonexcessive remission of an excise tax as failing to constitute a bounty or grant, must stand as a lawfully permissible interpretation of § 303. On this record, that interpretation is fully applicable to the Japanese Commodity Tax Law.

It follows that the Customs Court erred in granting Zenith's motion for summary judgment and in denying that of the United States. There being no issue of fact, the judgment of the Customs Court is reversed and the case is remanded for entry of an order granting the motion for summary judgment of the United States.

MILLER, Judge, dissenting, with whom BALDWIN, Judge, joins.

The issue is whether the Customs Court correctly determined that remission of the Japanese commodity tax upon export of the involved electronic goods, coupled with the levy of such tax on consumption of like goods in Japan, constitutes the payment or bestowal, "directly or indirectly," of a "bounty or grant" for purposes of section 303 of the Tariff Act of 1930, as amended (19 U.S.C. § 1303).

Contrary to the majority opinion, I conclude that the controlling question is a matter of law and not a factual inquiry into the "economic result" of the Japanese commodity tax; that this is really not a case of first impression, since the key language of the statute has been interpreted by the Supreme Court before; that the interpretation by the Court was basic to its decision and was not *obiter dictum*; that this judicial interpretation prevails over any long-continued administrative practice; and that

---

**33.** Mr. Justice White's dissent in *Saxbe* saw the statute there involved as leaving nothing open to construction, the administrative practice as in conflict with the statute, the Congress as not having been shown aware of the practice and its silence, which may have been due to unawareness, preoccupation or paralysis, as inadequate proof of acceptance. In the present case, "bounty" and "grant" have remained un- defined by Congress; the statute delegates to the Secretary the determination of what is a bounty or grant; the administrative practice is not in conflict with the statute, judicial decisions, or congressional expression; Congress has long and often been aware of the practice; and, concerning customs matters, Congress has in no manner been paralyzed.

Congressional "acquiescence" in such administrative practice is a myth.

I would affirm the decision and judgment of the Customs Court except with respect to the date as of which countervailing duties are to be imposed.

### The facts

The Customs Court stated the "essential facts" as follows:

The Japanese Commodity Tax Law, cited as Commodity Tax Law (March 31, 1962, Law No. 48) as revised, is a single-stage consumption tax which is levied usually at the manufacturing level on a fairly extensive list of consumer goods, inclusive of electronic products of the types manufactured by plaintiff. Rates of tax range generally from 5 to 40 percent. Upon exportation of these products from Japan, the tax is either remitted, if previously paid, or the products are exempted from the payment of the tax. [Footnote omitted.]

Additionally, in its answer to Zenith's complaint, the Government admitted that the commodity tax is levied on goods shipped for home consumption and that the tax base is generally the manufacturer's sales price; however, it denied, "for lack of knowledge or information sufficient to form a belief as to the truth thereof," that the commodity tax rates set forth in the complaint were applicable to the enumerated products.[1] Nevertheless, most of the rates alleged are shown in *An Outline of Japanese Taxes* 130–34 (1975), published by the Tax Bureau, Ministry of Finance (Lib.Cong.Ref. No. HJ

2986 .A3 1975), of which we may take judicial notice.[2]

### Controlling question a matter of law

The majority opinion declares that it is the economic result of the foreign government's action which controls [whether such action is a "bounty or grant"] and that this requires a factual inquiry. It then says that "the record is silent regarding the economic result of the mere remission of the Japanese commodity tax" and that "[t]he Secretary has presumably determined that the economic result here is not the conferring of such a benefit, subsidy, or incentive as would rise to the level of a bounty or grant under § 303." To this it adds: "The factual underpinnings of the Secretary's negative countervailing duty determination in this case are not under attack."

Of course, such "factual underpinnings" are not under attack, because there are none to attack. Indeed, even a *presumption* that the Secretary made a determination regarding the economic result is rebutted by the record. The majority opinion has confused the Secretary's determination of whether or not remission of the Japanese commodity tax constitutes the payment or bestowal, "directly or indirectly," of a "bounty or grant," which is a matter of law, with the factual determination yet to be made by the Secretary of the "net amounts of the bounty or grant paid or bestowed" (on the basis of which countervailing duties are to be assessed) in accordance with the order of the Customs Court.[3]

---

1. The complaint alleged the following rates: Large television receivers (20%); Small television receivers (15%); Color television picture tubes—large (20%) and small (15%); Radio receivers—stereo (15%), other than stereo (and other than housed in metal cases of specified dimension) (10%), and other than stereo housed in metal cases of said specified dimension (5%); Radio-phonograph combinations (15%); Radio-television-phonograph combinations—if television qualifies for 20% rate (20%) and if television qualifies for 15% rate (15%); Record players and phonographs (15%); Tape players, tape recorders, and radio/tape recorder combinations—stereo (15%) and other (10%).

2. The 5 to 40% range referred to by the Customs Court is shown in 1 W. Diamond, *Foreign Tax and Trade Briefs* 84.7 (1977), which notes that the commodity taxes "generally are paid by the manufacturer."

3. This court noted in *United States v. Hammond Lead Products, Inc.,* 440 F.2d 1024, 1029, 58 C.C.P.A. 129, 136, C.A.D. 1017 (1971), that "in the case of the countervailing duty assessment, no injury to a domestic industry need be shown."

Concerning the Secretary's "determination" here, all that the record shows is set forth in (1) the Notice of Preliminary Determination, approved by an assistant Secretary of the Treasury on January 30, 1975 (40 Fed.Reg. 5378), referring to the Notice of Countervailing Duty Proceedings [4] in the Federal Register of May 19, 1972 (37 Fed. Reg. 10087), and making a preliminary determination, on the basis of an investigation, that benefits under three Japanese programs (none of which related to the commodity tax) constituted bounties or grants, but were considered to be *de minimis*; (2) an amendment to said Notice of Preliminary Determination, approved by an Acting Assistant Secretary of the Treasury on May 2, 1975 (40 Fed.Reg. 19853), adding the following paragraph thereto:

> Any other programs alleged to result in the payment or bestowal of a bounty or grant within the meaning of section 303 of the Act have been terminated by the Japanese Government and/or are preliminarily determined not to result in the payment or bestowal of a bounty or grant.[5]

and (3) the Final Negative Countervailing Duty Determination, approved by an Acting Assistant Secretary of the Treasury on December 31, 1975 (41 Fed.Reg. 1298), merely repeating the Notice of Preliminary

Determination that information developed in the investigation established that benefits under the three Japanese programs (unrelated to the commodity tax) were *de minimis* and concluding as follows:

> Accordingly, on the basis of the additional facts gathered and the investigation conducted . . . a final determination is hereby made in this proceeding, that for the reasons stated, herein and in the notice referred to above [the Notice of Preliminary Determination], no bounty or grant is being paid or bestowed, directly or indirectly, within the meaning of section 303 . . . upon the manufacturer [sic], production, or exportation of certain consumer electronic products from Japan.

Thus, it is seen that there was no determination of economic result by the Secretary with respect to the Japanese commodity tax—not even a *de minimis* determination as in the case of the three other programs referred to—but only a conclusion of law that under any current programs, no bounty or grant is being paid or bestowed, directly or indirectly, within the meaning of section 303. It is the correctness of this conclusion of law that was before the Customs Court, whose decision thereon we review.[6]

---

**4.** The Notice stated that "Information has been received . . . which raises a question as to whether certain payments, bestowals, rebates, or refunds granted by the Government of Japan upon the manufacture, production, or exportation of certain consumer electronic products constitute the payment or bestowal of a bounty or grant, directly or indirectly, within the meaning of section 303 of the Tariff Act of 1930 (19 U.S.C. § 1303), upon the manufacture, production, or exportation of the merchandise to which the payments, bestowals, rebates, or refunds apply."

**5.** The broad language could be construed to encompass the Japanese commodity tax.

**6.** If the majority remains convinced that the economic result of the remission of the Japanese commodity tax is decisive of the issue before us, it should at least remand the case to the Customs Court for development of a record on that point, a task that court is specially equipped to undertake. Failing that, I suggest that the rates of the Japanese commodity tax

are such as to establish prima facie that the economic impact (*e.g.* competitiveness of Japanese exports vis-à-vis U. S. manufacturers) of remission of the tax would not be *de minimis*. Significantly, the United States Tariff Commission (now International Trade Commission) made the following statement in its report to the Senate Finance Committee, 5 TRADE BARRIERS 39 (1974):

> For all but a very few U. S. products, the differential between domestic and export prices which is attributable to the exemption of exports from internal consumption taxes is substantially lower than the price differential found in products of most other major trading nations resulting from the exemption of exports from their domestic consumption taxes. [Footnote omitted.]

In its report, THE FUTURE OF U. S. FOREIGN TRADE POLICY, 90th Cong., 1st Sess., 5 (Comm. Print 1967), the Joint Economic Committee of the Congress stated:

> The European Common Market practice of rebating their own indirect taxes on their

*Key language of statute previously interpreted by Supreme Court*

In *Downs v. United States,* 187 U.S. 496, 23 S.Ct. 222, 47 L.Ed. 275 (1903), the Supreme Court interpreted the key language of section 5 of the Tariff Act of 1897, 30 Stat. 205,[7] in the course of deciding, as the Court put it, *supra* at 500, 23 S.Ct. at 223—

the single question whether, under the laws and regulations of Russia, a bounty is allowed upon the export of sugar which subjects such sugar, upon its importation into the United States, to an additional duty equal to the entire amount of such bounty, under [section 5 of the Tariff Act of 1897].

The Russian scheme relieved exporters from the ordinary excise tax that would have been payable had the sugar been sold domestically and also provided exporters with certificates which could be sold to sugar producers, who would use them to free-up their surplus sugar for sale in the domestic market without payment of a prohibitive tax burden.

As noted in the majority opinion, the Board of General Appraisers (4 Treas.Dec. 405, T.D. 22984 (1901)) stated, at 413:

Our conclusion, therefore, is that a bounty or grant, within the meaning of section 5 of our tariff act, has been paid or bestowed by the Russian Government upon the exportation of this sugar, so as to work a benefit or advantage to the Russian sugar exporter as follows:

First. Upon the exportation of the sugar, the Government remitted or refunded the excise tax due thereon . . so that he was enabled to place his product upon the market free from the burden of either the regular or additional excise tax.

Second. The certificate which the Government issued to him upon the exportation of his sugar had a substantial market value, and was transferable, and operated as a premium, grant, bonus, or reward.

Looked at from the Russian standpoint, these advantages might, perhaps, be described as a bounty on production, but (in the language of the circuit court of appeals in the *Hills Brothers* case [*United States v. Hills Bros. Co.,* 107 F. 107 (CA 2 1901)], *supra*) "from the standpoint of *other countries," they* become a bounty or grant on exportation." [Emphasis supplied.]

Although the Fourth Circuit, in affirming the Circuit Court for the District of Maryland, which had affirmed the Board (opinion unreported), held that the Government of Russia secured to the exporter of that country a money reward or gratuity whenever he exported sugar from Russia and premised that holding on its finding that the Russian exporter of sugar received a certificate, it said (*Downs v. United States,* 113 F. 144, 146 (CA 4 1902):

In affirming the decree of the court below, we also affirm the judgment rendered by the board of general appraisers,

exports and levying these same taxes on imports—a practice sanctioned, incidentally, by the rules of the GATT—constitutes a conspicuous form of discrimination against U. S. exports. Moreover, similar border adjustments by the United States would be an ineffective weapon, neither mitigating nor offsetting the discriminatory process, because the tax structure of the United States places relatively small emphasis on indirect taxes. This issue is one that the United States will have to resolve.

7. "That whenever any country . . . shall pay or bestow directly or indirectly, any bounty . . . upon the exportation of any article or merchandise from such country . . . ." There is no support for the statement in the majority opinion that there was "congressional

refusal" to define the words "bounty" or "grant." Customs Law dictates that the common meaning of such words is intended in the absence of evidence to the contrary. *United States v. C. J. Tower & Sons,* 48 CCPA 87, 89, C.A.D. 770 (1961); *Meyer & Lange v. United States,* 6 Ct.Cust.App. 181, T.D. 35436 (1915). *Webster's International Dictionary* (1890) defines "bounty" as:

4. A premium offered or given . . . to encourage any branch of industry, as husbandry or manufactures.

It was merely customary legislative practice for Congress to leave it to the Treasury Department, subject to judicial review, to make individual determinations within such a broad definition.

whose opinion so fully expresses our views, and so ably presents the facts involved herein and the law applicable thereto, that we deem it entirely appropriate to adopt the same as part of the opinion of this court.

It is clear that the Supreme Court regarded both the remission of excise taxes upon exportation and the provision of certificates to exporters in assessing the Russian scheme. However, the basis of its decision rested on its interpretation of the key statutory language, particularly the term "bounty." Thus, it explained, *supra* 187 U.S. at 502, 23 S.Ct. at 223:

A bounty may be direct, as where a certain amount is paid upon the production or exportation of particular articles, of which the act of Congress of 1890, allowing a bounty upon the production of sugar, and Rev.Stat. sections 3015–3027, allowing a drawback upon certain articles exported, are examples; or indirect, by the remission of taxes upon the exportation of articles which are subjected to a tax when sold or consumed in the country of their production . . . . .

Later in its opinion, the Court applied this interpretation to the Russian government's remission of excise taxes as follows, *supra* at 515, 23 S.Ct. at 228:

The details of this elaborate procedure for the production, sale, taxation and exportation of Russian sugar are of much less importance than the two facts which appear clearly through this maze of regulations, viz.: that no sugar is permitted to be sold in Russia that does not pay an excise tax of R. 1.75 per pood and that sugar exported pays no tax at all. . . When a tax is imposed upon all sugar produced, but is remitted upon all sugar exported, then, by whatever process, or in whatever manner, or under whatever name, it is disguised, it is a bounty on exportation.

With respect to the certificate part of the Russian scheme, the Court noted, *supra* at 512, 23 S.Ct. at 227:

It is practically admitted in this case that a bounty equal to the value of these certificates is paid by the Russian government, and the main argument of the petitioner is addressed to the proposition that this bounty is paid, not upon exportation, but upon production.

Referring to the certificate as an *additional* bounty, the Court then proceeded to answer petitioner's argument and to determine that the certificate came within its interpretation of the key statutory language, *supra* at 513, 23 S.Ct. at 228:

If the additional bounty paid by Russia upon exported sugar were the result of a higher protective tariff upon foreign sugar, and a further enhancement of prices by a limitation of the amount of free sugar put upon the market, we should regard the effect of such regulations as being simply a bounty upon production, although it might incidentally and remotely foster an increased exportation of sugar; *but where in addition to that these regulations exempt sugar exported from excise taxation altogether,* we think it clearly falls within the definition of an indirect bounty upon exportation. [Emphasis supplied.]

Thus, the fact that this "additional bounty" was coupled with remission of the excise tax, which the Court determined to come within its interpretation of "bounty upon exportation" in the statute, was the basis for its decision that the certificate was "an indirect bounty upon exportation." *Had the Court not determined that remission of the excise tax was a "bounty on exportation," its decision on the certificate portion of the Russian scheme would have been otherwise.*

Not to be overlooked is the fact that in their briefs before the Court, both Downs and the Government argued the question of whether the remission of excise taxes upon exportation of sugar is a "bounty or grant on exportation" as the terms were used in the statute, with Downs, the importer, contending in the negative and the Government saying (R 236):

For it seems that any special favor, benefit, advantage, or inducement conferred by the Government, even if it is given as

a release from the burden and is not a direct charge upon the Treasury, is fairly included in the idea and meaning of an indirect bounty.

Nevertheless, the majority opinion would treat the Supreme Court's interpretation of the key language in section 5 as mere dictum, saying that the court's decision was that the Russian scheme (as a whole) bestowed a bounty and that "the broad language" (quoted above) "was not necessary to the Supreme Court's decision and was not, therefore, its ratio decidendi"; further, that the "broad language did not constitute a Supreme Court holding that every nonexcessive remission of every excise tax constitutes a bounty or grant as a matter of law." Of course, the quoted interpretative language did not say that every nonexcessive remission of every excise tax constitutes a bounty or grant. The Court carefully phrased its interpretation to couple with such remission the condition that such tax be paid on the articles when sold or consumed domestically.[8] To conclude that, because the decision had to do with the "Russian scheme," which included *two* bounties, (1) remission of the excise tax and (2) provision of certificates of value, the Court's interpretation of "bounty" with respect to the remission of the excise tax portion of the scheme is not ratio decidendi is manifestly erroneous. As pointed out above, that interpretation was the basis for the decision that the certificate portion of the

scheme was an indirect bounty upon exportation. Moreover, since the Supreme Court clearly determined that *both* remission of the excise tax and the certificate constituted a bounty, there were two grounds upon either of which it rested its decision. Each ground represented the judgment of the court and was of equal validity with the other. *Woods v. Interstate Realty Co.*, 337 U.S. 535, 537, 69 S.Ct. 1235, 93 L.Ed. 1524 (1949); *Massachusetts v. United States*, 333 U.S. 611, 623, 68 S.Ct. 747, 92 L.Ed. 968 (1948); *Richmond Co. v. United States*, 275 U.S. 331, 340, 48 S.Ct. 194, 72 L.Ed. 303 (1928); *United States v. Title Insurance Co.*, 265 U.S. 472, 486, 44 S.Ct. 621, 68 L.Ed. 1110 (1924); *Union Pacific Co. v. Mason City Co.*, 199 U.S. 160, 166, 26 S.Ct. 19, 50 L.Ed. 134 (1905); *Railroad Companies v. Schutte*, 103 U.S. 118, 143, 26 L.Ed. 327 (1880).

Thus, the Court's determination that remission of the excise tax was a "bounty" did not constitute mere *obiter dictum* as did the statement treated in *Kastigar v. United States*, 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972), cited by the majority, whose assertion that "we confront a case of first impression" simply begs the question. Rather, the Court's interpretation is akin to the Court's explanation in *Towne v. Eisner*, 245 U.S. 418, 38 S.Ct. 158, 62 L.Ed. 372 (1918), of the essential nature of a stock dividend in interpreting the Income Tax Act of October 3, 1913.[9] That explanation

---

**8.** Whether the "bounty or grant" in a particular case would be *de minimis* (not, therefore, warranting imposition of a countervailing duty) or what the net amount of the "bounty or grant" would be as a basis for imposition of a countervailing duty is, of course, another matter. Thus, as appellant has shown, the market value of the certificate in *Downs* was from 1.25 to 1.64 rubles per pood, and the excise tax remitted was 1.75 rubles per pood; whereas, the *net* bounty determined ranged from only .38 to .50 rubles per pood (T.D. 22814, 4 Treas.Dec. 184 (1901)). It is not disclosed what factors entered into the determination. See *F. W. Woolworth Co. v. United States*, 115 F.2d 348, 28 CCPA 239, C.A.D. 151 (1940).

**9.** In *Towne v. Eisner*, the question was whether a stock dividend made in 1914, against surplus earned *before* the effective date of the Six-

teenth Amendment, was taxable under the Income Tax Act of October 3, 1913. The lower court had decided for the taxpayer, treating the question as inseparable from interpretation of the Sixteenth Amendment. The Supreme Court disposed of the question upon consideration of the essential nature of a stock dividend, disregarding the fact that the dividend involved was based upon surplus earnings that accrued before the Sixteenth Amendment took effect, and quoting from its opinion in *Gibbons v. Mahon*, 136 U.S. 549, 10 S.Ct. 1057, 34 L.Ed. 525 (1890) as follows:

"A stock dividend really takes nothing from the property of the corporation, and adds nothing to the interests of the shareholders. Its property is not diminished, and their interests are not increased. . . . The proportional interest of each shareholder remains the same. The only change is in the

was relied upon by the Court in *Eisner v. Macomber*, 252 U.S. 189, 40 S.Ct. 189, 64 L.Ed. 521 (1920), where the question was whether a stock dividend, made against profits accumulated by a corporation *after March 1, 1913*, was taxable under the Revenue Act of 1916. In affirming the judgment below for the taxpayer, the Court said, *supra* at 204–05, 40 S.Ct. at 192:

> Therefore, *Towne v. Eisner* cannot be regarded as turning upon the point that the surplus accrued to the company before the act took effect and before adoption of the Amendment. And what we have quoted from the opinion in that case cannot be regarded as *obiter dictum*, it having furnished the entire basis for the conclusion reached. We adhere to the view then expressed, and might rest the present case there . . . because the conclusion there reached as to the essential nature of a stock dividend necessarily prevents its being regarded as income in any true sense.

In its efforts to downgrade *Downs*, the majority opinion ignores the Supreme Court's own recognition of its precedential value in *Nicholas & Co. v. United States*, 249 U.S. 34, 39 S.Ct. 218, 63 L.Ed. 461 (1919), which involved the petitioner's pro-

test against the action of collectors of customs at Boston and New York assessing countervailing duties on whiskey and gin imported from Great Britain. The Supreme Court affirmed the judgment of the Court of Customs Appeals (the predecessor to this court), which had affirmed a decision by the Board of General Appraisers (the predecessor to the Customs Court) overruling the protests. The issue was the legality of the countervailing duty, which had been determined to be necessary under Paragraph E of section 4 of the Tariff Act of 1913 (38 Stat. 114) [10] by reason of the allowance under British law of three pence per gallon upon plain British spirits and five pence per gallon upon British compounded spirits paid on account of export from the United Kingdom.[11] Referring to Paragraph E, the Court, *supra* at 39, 39 S.Ct. at 220, said:

> The statute was addressed to a condition and its words must be considered as intending to define it, and all of them— "grant" as well as "bounty"—must be given effect. If the word "bounty" has a limited sense the word "grant" has not. A word of broader significance than "grant" could not have been used. Like

evidence which represents that interest, the new shares and the original shares together representing the same proportional interest that the original shares represented before the issue of the new ones." *Gibbons v. Mahon*, 136 U.S. 549, 559, 560, 10 S.Ct. 1057, 34 L.Ed. 525. In short, the corporation is no poorer and the stockholder is no richer than they were before. . . . What has happened is that the plaintiff's older certificates have been split up in effect and have diminished in value to the extent of the value of the new. [*Id.* at 426–27, 38 S.Ct. at 159.]

10. Paragraph E was substantially the same as section 303 of the Tariff Act of 1930 and as section 303(a)(1) under the 1970 amendment, the statute herein involved. Paragraph E was preceded by Paragraph E of section 4 of the Tariff Act of 1913 (38 Stat. 114, 193); section 6 of the Tariff Act of 1909 (36 Stat. 11, 85); and section 5 of the Tariff Act of 1897 (30 Stat. 151, 205). Prior to the latter, paragraph 182½ of the Tariff Act of 1894 (28 Stat. 509, 521) provided for payment of additional duty on sugar, syrups, and molasses where the exporting country paid a *bounty* on the export thereof; and paragraph 237 of the Tariff Act of 1890 (26

Stat. 567, 584) made similar provision in the case of sugar only. In its brief, the Government contends that the 1897 Act was intended to apply to the refund of taxes only to the extent that the "refund" exceeded the amount of tax actually paid (*i. e.* the "excessive remission"). This appears to have been so under the specific language of the 1890 and 1894 Acts. However, different language appeared in the subsequent acts, and the legislative history of the 1897 Act cited by the Government can hardly be used now to overturn the Supreme Court's interpretation in *Downs* of "bounty" in the 1897 Act. The Government's argument, of course, has no application to "grant" (added by the 1897 Act). If it did, it would imply that there was no Congressional purpose in adding "grant" to the language of the statute.

11. The law also provided for payment of an allowance of two pence per gallon "to any Distiller or Proprietor of . . . Spirits on the Exportation thereof from a Duty-free Warehouse, or in depositing the same in a Customs Warehouse." However, this payment was not involved in the case.

its synonyms "give" and "bestow," it expresses a concession, the conferring of something by one person upon another. And if the "something" be conferred by a country "upon the exportation of any article or merchandise" a countervailing duty is required by Paragraph E.

The Court next, *supra* at 39–40, 39 S.Ct. at 220, stated, in language reminiscent of *Downs*, the pragmatic principle on which it rested its decision that the payment by the British government was the bestowal "directly or indirectly" of a "bounty or grant":

> We have the fact of spirits able to be sold cheaper in the United States than in the place of their production, and this the result of an act of government because of the destination of the spirits being a foreign market. For that situation Paragraph E was intended to provide.

The Court cited *United States v. Passavant*, 169 U.S. 16, 18 S.Ct. 219, 42 L.Ed.2d 644 (1898), as support for its pragmatic approach, saying: "It [the Court in *Passavant*] regarded the fact and effect of the remitted excise." [12] It then recognized the precedential value of *Downs*,[13] *supra* 249 U.S. at 41, 39 S.Ct. at 221:

> *Downs v. United States*, 187 U.S. 496, 23 S.Ct. 222, 47 L.Ed. 275, is a like example [of the pragmatic approach], and direct and indirect bounties are illustrated. . . . *[A]s instances of the latter, that is, of indirect bounties, the remission of taxes upon the exportation of articles which are subject to a tax when sold or consumed in the country of their production is given*, and, as another example, the laws permitting distillers of spirits to export the same without payment of an internal revenue tax or other burden. [Emphasis supplied.]

If the majority's erroneous approach to precedent were followed, the judicial function of statutory interpretation would be reduced to merely deciding that the facts of a particular case are or are not within the reach of a particular statute. The judicial function of giving life and meaning to the words of a statute for guidance to other courts as well as to the executive and legislative branches of government would be emasculated, and interminable litigation would be spawned.[14]

*Judicial interpretation prevails over "long-continued, uniform, administrative practice"*

The majority opinion states that, since 1898, the Treasury Department has consistently and uniformly interpreted § 303 as requiring that for a remission of an excise tax to constitute a bounty it must be "excessive." [15] It then cites the familiar rule that long-continued, uniform administrative practice, if not contrary to or inconsistent with law, is entitled to great weight, particularly when Congress has failed to revise the statute in the face of such administrative practice; and it finds no Congressional action contrary to or inconsistent with that practice. However, it is to be noted that in

---

**12.** *Passavant* held that in determining dutiable value of goods imported from Germany, there should be added to the net invoice price the amount of tax imposed upon the goods when sold by the manufacturer thereof for consumption or sale in Germany but remitted upon exportation of the goods.

**13.** As had the Government in its brief, saying of *Downs*:

> The Russian bounty case was summed up in a single sentence in the opinion (187 U.S. 515, 23 S.Ct. 228):
> "When a tax is imposed on all sugar produced, but is remitted upon all sugar exported, then, by whatever process, or in whatever manner, or under whatever name it is disguised, it is a bounty upon exportation."

**14.** *Cf.* E. Griswold, The Judicial Process 31 (1973): "In many areas precedents, especially ones of a few years' standing, are not given very great weight. This in turn stimulates litigation on a great mass of questions . . . . .

**15.** This statement apparently does not take account of the countervailing duties assessed by Treasury in *Downs* and the Government's position in its brief before the Supreme Court in support thereof, wherein the Assistant Attorney General went so far as to say (R 236):

> For it seems that any special favor, benefit, advantage, or inducement conferred by the Government, even if it is given as a release from burden and is not a direct charge upon the Treasury, is fairly included in the idea and meaning of an indirect bounty.

none of the cases cited by the majority opinion had there been a judicial interpretation with which the administrative practice was in conflict!

There is another familiar rule, namely: continued reenactment of a statute following its judicial interpretation (especially by the Supreme Court) creates a presumption of Congressional approval of that interpretation. *Shapiro v. United States*, 335 U.S. 1, 16, 68 S.Ct. 1375, 92 L.Ed. 1787 (1947); *Burnet v. Harmel*, 287 U.S. 103, 108, 53 S.Ct. 74, 77 L.Ed. 199 (1932); *Hecht v. Malley*, 265 U.S. 144, 153, 44 S.Ct. 462, 68 L.Ed. 949 (1924); *Latimer v. United States*, 223 U.S. 501, 504, 32 S.Ct. 242, 56 L.Ed. 526 (1912); *Sessions v. Romadka*, 145 U.S. 29, 42, 12 S.Ct. 799, 36 L.Ed. 609 (1892). As will be more fully developed later, there has been no Congressional action contrary to or inconsistent with the interpretation of the key statutory language in *Downs*.

When there is a conflict between administrative practice and judicial interpretation, as has been the case here, this court's predecessor long ago held that judicial interpretation prevails. *United States v. Douglas & Berry*, 6 Ct.Cust.App. 100, T.D. 35342 (1915). That case involved the question of whether the imported goods in question were classifiable as "plain woven fabrics" under paragraph 283 of the Tariff Act of 1913. In two earlier cases, the court had interpreted identical language in the predecessor provisions to paragraph 283 (contained in the Tariff Acts of 1897 and 1909) and had rejected the classification of similar goods as "plain woven fabrics." Responding to the importers' argument that goods like those in question were, during the history of the Tariff Act of 1909, classified as plain woven fabrics and that employment of that language in the Tariff Act of 1913 must be presumed to be a recognition of such administrative practice, the court said *supra* at 104:

> Force is often given to such administrative practice, but in the present case it is difficult to see how it could have the force contended for, for the reason that prior to the enactment of this tariff law

rulings of this court had been made in the two cases cited, and more specifically and definitely in the later case of *White v. United States* [*United States v. White & Co.*] (3 Ct.Cust.Appls., 382; T.D. 32968), that excluded the goods in question from the term "plain woven fabrics," and *it is the latter authoritative decision which the Congress must be presumed to have followed rather than the administrative practice.* [Emphasis supplied.]

The fact that the executive branch does not follow the interpretation of a law by the judicial branch does not render that interpretation any less the law. Nor would acquiescence by the legislative branch in the failure of the executive branch to follow the interpretation of the law by the judicial branch do so. Indeed, a contrary conclusion would deny the role of the judicial branch in our system of government "to say what the law is," as declared in *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177, 2 L.Ed. 60 (1803).

### *The myth of Congressional acquiescence in administrative practice*

Although the principle stated in *United States v. Douglas & Berry* disposes of the administrative practice point, the following portion of the majority opinion should be answered:

> [W]e find it difficult to believe that Congress would harbor in its breast a disapproval of an administrative practice for almost 80 years, while remaining so supine or irresponsible as not to change it. . . . Though the record shows the first specific notice to Congress in 1949, we cannot assume that Congress had earlier reenacted the statute four times without ever informing itself of Treasury's practice. But whether awareness of the practice has continued for 79 years or for 28 years, the inference of acquiescence from Congress' failure to act against the practice over the many years involved, and through many reenactments of the statute, overbalances any inference of rejection from failure to codify it. [Footnote omitted.]

Actually, the record shows that the "first specific notice to Congress" came in 1949 during the course of hearings before the Senate Finance Committee. In 1970 Congress amended section 516 of the Tariff Act of 1930 to provide that, in the case of any imported article or merchandise with respect to which the Secretary has not determined whether or not any bounty or grant is being paid, any person may file a petition setting forth his belief that a bounty or grant is being paid.[16] The Customs Administrative Act of 1970 § 209, Pub.L. No. 91–271, 84 Stat. 274, 286. (Zenith filed such a petition in this case.) So the period of "awareness" of Treasury's practice on the part of "Congress" before it endeavored to do something about the practice shrinks from 79 to 21 years. The supposition in the majority opinion of a longer period of "awareness" on the part of *Congress* is pure speculation.

As Judge Newman noted in his concurring opinion below, the Treasury Department attempted to persuade Congress to amend section 303 of the Tariff Act of 1930 to accord with the Department's practice of not assessing countervailing duties on the remission of taxes.[17] This and another attempt (by the State Department)[18] failed. In the perspective of the principle stated in *United States v. Douglas & Berry, supra,* Judge Newman aptly remarked:

> It is apparent, then, that Congress could have, but declined to, nullify the Supreme

Court's interpretation of the countervailing duty statute insofar as tax remissions are concerned. A reasonable conclusion from the congressional rejection of the . . . proposed amendments . . . is that Congress was satisfied with the way it had earlier written the statute, and approved of the Supreme Court's construction of the law.[19]

The majority opinion recalls that during hearings before the House Committee on Ways and Means in 1973 on the bill which matured into the Trade Act of 1974 (Pub.L. No. 93–618, 88 Stat. 1978), "a witness" recommended an amendment defining "bounty or grant" as encompassing the remission of an excise tax and that there was no action taken on the recommendation. This can hardly be said to rise to the level of Congressional acquiescence in administrative practice, much less a repudiation by Congress of the interpretation of the key language in section 303 by the Supreme Court.

The majority opinion points to Congressional adoption, as § 321(b) of the Trade Act of 1974, of an amendment to the Antidumping Act, 19 U.S.C. § 162 (Supp. V 1975), which parallels the standard in that Act to the standard set forth in the countervailing duty law; further, to the following statements in the committee reports:

> However, your committee [Ways and Means], in recommending this amendment, does not express approval or disap-

---

**16.** If the Secretary concludes that a formal investigation is warranted, he is to initiate one, make a preliminary determination within six months, and make a final determination within twelve months.

**17.** *Hearings on H.R. 1535 Before the House Committee on Ways and Means,* 82d Cong., 1st Sess. 2, 16, 35, and 79 (1951). (H.R. 1535, which would have been entitled "Customs Simplification Act of 1951," was introduced "by request" of the Secretary.) *Hearings on H.R. 5505 Before the Senate Committee on Finance,* 82d Cong., 2d Sess. 115, 124–25 (1952). (H.R. 5505 supplanted H.R. 1535 as a "clean bill.")

**18.** The Department's representative advised the Senate Finance Committee that an amendment to conform section 303 with administrative practice was needed to make the countervailing duty law fully consistent with Article VI

of the General Agreement on Tariffs and Trade. *Hearings on H.R. 1612* ("Trade Agreements Extension Act of 1951") *Before the Senate Committee of Finance,* 82d Cong., 1st Sess. 11 (1951).

**19.** The majority opinion notes an earlier unsuccessful attempt by Treasury in 1950, but says: "Congress' failure to act or even speak against it [the Treasury proposal] reflected at least a then-current willingness to allow that administrative practice to continue unabated and unchanged." Such a comment ignores the principle stated in *United States v. Douglas & Berry, supra.* The correct conclusion to be drawn from failure of the Treasury proposal is that stated by Judge Newman. See *United States v. Adolphe Schwob, Inc.,* 21 CCPA 116, 120, T.D. 46447 (1933).

proval of the standard employed by the Treasury Department in administering the countervailing duty law with regard to the treatment under that law of rebates or remissions of direct and indirect taxes. [H.R.Rep. No. 93–571, 93d Cong., 1st·Sess. 69 (1973).]

And—

The standard in the proposed amendment parallels that standard employed by the Treasury Department under the countervailing duty law in determining whether tax rebates and remissions constitute bounties or grants. However, the Committee [Senate Finance], in recommending this amendment, does not express approval or disapproval of that Treasury practice. [S.Rep. No. 93–1298, 93d Cong., 2d Sess. 172 (1974), U.S. Code Cong. & Admin. News 1974, pp. 7186, 7309.]

On the basis of the foregoing, the majority opinion concludes: "The effect of the Committees' mutually contradictory approve-disapprove statements is necessarily to leave untouched the status quo with respect to the administrative practice on countervailing duties." Again the majority ignores the principle stated in *United States v. Douglas & Berry, supra.* The correct conclusion is that such statements left untouched the status quo with respect to the Supreme Court's interpretation of the key language in section 303.

The majority opinion notes that, in 1968, the Senate Finance Committee was advised that Treasury considered § 303 inapplicable to nonexcessive remissions of excise taxes; that no action was taken at that time; and that, in 1970, the Committee requested a detailed study on the subject. The "request" was a direction to the Tariff Commission contained in section 362 of H.R.

17550, which did not become law. The Senate Finance Committee, in its report on the bill (S.Rep. No. 91–1431, 91st Cong., 2d Sess. 281 (1970) ) stated, *inter alia*:

The committee is also aware of the Supreme Court cases, and a recent Customs Court case which has interpreted the words "bounty" or "grant" to apply to virtually all subsidies, including the rebate of indirect taxes.

A request for a study was subsequently made jointly by the chairman of the Senate Finance Committee and the chairman of the Subcommittee on International Trade to the Tariff Commission, which transmitted its voluminous report, Trade Barriers, *supra* note 6, in 1974.[20] This can hardly be said to rise to the level of a repudiation by the Congress of the interpretation of the key language in section 303 by the Supreme Court. Rather, the request for a study by the Tariff Commission constituted merely a prudent step by a Congressional committee to acquire information needed to make a decision whether to recommend any changes in the law beyond the 1970 amendment, referred to above, providing for the filing of a petition by any person setting forth his belief that a bounty or grant is being paid. Following receipt of the Trade Commission's report, the judicial review provision, discussed *infra*, was enacted as part of the Trade Act of 1974.

Referring to this court's opinion in *American Express Co. v. United States,* 472 F.2d 1050, 60 CCPA 86, C.A.D. 1087 (1973), the majority opinion says that "we expressed the view that Congress required the Secretary to impose a countervailing duty when a bounty or grant has been bestowed, but left to the Secretary the determination of whether a bounty or grant had in fact been

**20.** Of particular significance, the report (Vol. VI at 30–31) states:

Several governments provide tax advantages to exporters. This is done usually by exempting or deferring taxes on income from export activities, or rebating other direct taxes associated with the production of exported products, or by accelerated amortization of assets used in production for export.

Under current GATT rules, indirect (consumption) taxes may be rebated (or not collected) on exported products, but rebates of direct taxes (income and certain other taxes) are not permitted. This rule is based on the premise that indirect taxes are fully shifted forward to the consumer, whereas direct taxes are not. To the extent, however, that the forward shifting of indirect taxes is incomplete, the full restitution of the domestic consumption tax at the border on exported products acts, in effect, as a subsidy of exports. [Footnote omitted.]

bestowed" and that "[n]othing has occurred since 1973 to require change in that view." However, a close reading of the opinion in that case reveals no suggestion whatsoever that this court would approve a Secretarial determination that was contrary to the interpretation of "bounty" by the Supreme Court. With respect to what has occurred since 1973, provision in the Trade Act of 1974 for judicial review of the Secretary's determination that a bounty or grant is not being paid on foreign merchandise reflects, as shown *infra* note 26, expressed *Congressional concern* over "inaction or insufficient action, or . . . excessive delay in the administrative process."

That provision was enacted in response to the majority opinion of this court in *United States v. Hammond Lead Products, Inc.,* *supra* note 3. Hammond Lead had filed a complaint with the Commissioner of Customs asserting that litharge [21] imported from Mexico was the recipient of a bounty or grant from the Mexican government and, therefore, that a countervailing duty was required to be imposed under section 303 of the Tariff Act of 1930. The Commissioner of Customs, acting for the Secretary, responded that the classification and rate of duty on litharge was correct and that countervailing duties were not applicable. Hammond Lead then brought an action in the Customs Court under section 516(b) of the Tariff Act of 1930, protesting the classification and rate of duty. The Government and one Ralph Valls, Party-In-Interest, moved to dismiss on the ground that the Customs Court lacked jurisdiction of the subject matter of an American manufacturer's protest which complained that the Secretary failed to invoke a countervailing duty. Motions to dismiss were denied, and trial on the merits followed. The Customs Court sustained Hammond Lead's protest on the theory that there was an indirect bounty or grant on export of the litharge from Mexico.[22]

On appeal, this court, split 3-2, held that the Customs Court lacked jurisdiction.[23] It concluded, *supra* 440 F.2d at 1030, 58 CCPA at 137:

All considered, it appears that countervailing duty is a penal exaction [24] that the Congress did not intend the courts to impose, should the Treasury be recalcitrant, in a 516(b) proceeding . . . . .

In the course of extended dicta, the majority opinion obliquely referred to the "dicta" in *Downs* and went on to say, *supra* 440 F.2d at 1032, 58 CCPA at 140–41:

It may be asked, if our interpretation of section 516(b) is correct, does it leave the American Manufacturer entirely remediless even in case of an arbitrary and capricious refusal by Treasury to take appropriate action under the countervailing duty law. It is difficult to answer the question without deciding in dictum cases not before us, but a few observations will be made. The Second Circuit, in *J. C. Penney Company Inc. v. United States,* 439 F.2d 63 (decided March 1, 1971), has considered the new statute and reaffirmed holdings under the old, that the regular Federal courts will not interfere in customs cases reviewable in the

---

**21.** The court stated that litharge is a lead oxide, made from refined lead by a simple process and containing 93% primary lead metal. Its main use is in storage batteries and in the chemical and paint industries.

**22.** Following devaluation of the peso in 1954, Mexico increased export taxes on refined lead for the purpose of maintaining domestic supplies and keeping down domestic prices. Refined lead was made available to domestic users at a price approximating the world price minus what the export tax would have been. Exports of litharge were not subjected to the export tax, so that Mexican litharge producers could offer litharge in other countries at a price predicated on the domestic lead price unenhanced by the export tax.

**23.** The dissenting opinion concluded that the Customs Court had jurisdiction of the protest under section 516(b), citing *Bradford Co. v. American Lithographic Co.,* 12 Ct.Cust.App. 318, T.D. 40318 (1924). Further, it stated that the Customs Court was correct in concluding that there was a bounty or grant, citing the definitions thereof in *Nicholas* and *Downs, supra.*

**24.** The statement that a countervailing duty is "penal" was repudiated in a 1972 Senate Finance Committee report. *Infra,* note 26.

Customs Court, because an importer desires to tailor a remedy more satisfactory to him than the Customs Court affords. . . . Thus it may be that any decision limiting 516(b) may correspondingly limit the access of a complaining domestic industry to any kind of court relief. On the other hand, the modern tendency to fashion a remedy for any injury is a strong one, and it could be the regular courts would take jurisdiction in cases outside section 516(b), where the domestic industry showed clear illegality and substantial injury. Such a proceeding would not be a *de novo* determination like the one the court below made here, but would, we think, be more in the nature of a review of the administrative decision, which would be overturned only if found arbitrary, capricious, or not founded on substantial evidence. A court considering the fashioning of such relief would have to consider its need in light of judicial remedies, and also such extrajudicial ones as the domestic industry might have, in resort to the Congress or to the Tariff Commission. We do not undertake to predict the answer.

The response of Congress was to include in the Trade Act of 1974 an amendment to section 516 which, as noted above, provides

for judicial review of the Secretary's determination that a bounty or grant is not being paid on foreign merchandise.[25] As a prelude to this Congressional action, in 1972 the Senate had tacked onto a minor House-passed tariff bill an amendment providing for judicial review, at the instance of American producers, of negative countervailing duty determinations by the Secretary.[26] Although the amendment was accepted by the House-Senate conferees (H.R.Rep. No. 92–1583, 92d Cong., 2d Sess. (1972); S.Rep. No. 92–1298, 92d Cong., 2d Sess. (1972)), the Conference Report was not brought to a vote in the House as an accommodation to the Secretary, with the understanding that the matter would be given attention in the context of trade legislation in the next Congress (118 Cong.Rec. 37098 (1972)). The judicial review provision was subsequently included in the House-passed version of what became the Trade Act of 1974, with the House Ways and Means Committee Report expressing similar views to those of the Senate Finance Committee (quoted in note 26, *supra*) in its report accompanying the 1972 bill (H.R.Rep. No. 93–571, 93d Cong., 1st Sess. 76 (1973)).

In view of the foregoing, the conclusion is inescapable that the Congress has not acquiesced in the administrative practice of

25. Review can be sought in the Customs Court by "an American manufacturer, producer, or wholesaler of merchandise of the same class or kind as that described in such determination."

26. In reporting out the amended bill, the Senate Finance Committee report (S.Rep. No. 92–1221, 92d Cong., 2d Sess. 8 (1972)) stated:

The Committee amendment providing judicial review to domestic producers in countervailing duty cases is necessitated because of a 1971 decision of the Court of Customs and Patent Appeals (*United States v. Hammond Lead Products, Inc.*) holding that judicial review was not available to American producers in countervailing duty cases. The Committee is concerned that the decision might adversely affect the ability of American producers to obtain meaningful relief against subsidized import competition under the Countervailing Duty Law (section 303 of the Tariff Act) because of administrative inaction or insufficient action, or because of excessive delay in the administrative process.

In addition, importers enjoy the right to judicial review in countervailing duty cases

under existing law. The Committee believes that American producers as well as importers should be permitted to have the right to judicial review in countervailing duty cases as a matter of basic equity and fairness, and as a means to secure administration of the law in keeping with the intent of Congress reflected in the broad, explicit and mandatory terms used in section 303.

The Countervailing Duty Law requires the Secretary of the Treasury to assess an additional duty on imports of dutiable articles with respect to which a bounty or grant has been paid. The additional duty must be equal to the amount of the bounty or grant, thereby neutralizing the artificial advantage afforded the foreign product by virtue of the subsidy. Consequently, countervailing duties are not, nor were they ever intended to be, penal in nature: they are remedial in nature inasmuch as they operate to offset the effect of subsidies afforded foreign merchandise.

failing to recognize the ordinary remission of excise taxes as a bounty or grant for purposes of section 303, much less repudiated, or given any signal of its disfavor with, the interpretation of the key language in section 303 by the Supreme Court.

### Date for imposition of countervailing duties

The Customs Court ordered that countervailing duties be assessed on the subject electronic products exported from Japan effective the day following the date of entry of its order. Section 516(g) of the Tariff Act of 1930, as amended (19 U.S.C. § 1516(g)), provides that only merchandise entered for consumption (or withdrawn from warehouse for consumption) after the date of *publication* of a Customs Court's decision will be affected. Therefore, the Government argues that the Customs Court's order in this case "encompasses entries the liquidation of which is not the proper subject of direction by the Customs Court under the enabling statute, which is clearly jurisdictional in its scope and effect." Appellee contends that *entry* of the Customs Court's order constituted *"publication"* for purposes of section 516(g) and that the Customs Court's order was proper.

Section 257 of 28 U.S.C. provides that all decisions of the Customs Court shall be filed and be open to inspection and that the Secretary shall *publish* weekly such decisions as he or the court may designate and abstracts of all other decisions. Thus, the statutes distinguish between filing or entry of a decision and *publication* thereof, which obviously would not occur simultaneously with the filing or entry. Until January 4, 1967, publication was in "Treasury Decisions." Effective January 4, 1967, the name was changed to "Customs Bulletin" (31 Fed.Reg. 16580).

Although appellee argues that "publication" means "making available to the public," which would occur upon the filing or entry of court orders and decisions, I am satisfied that the word "publication" in section 516(g) and the word "publish" in section 257 are in pari materia; further, that

acquiescence by Congress in the Secretary's practice of carrying out its mandate in section 257 creates a presumption of Congressional approval of that practice. Appellee has provided no evidence clearly showing Congressional disapproval of that practice.

Accordingly affirmance of the Customs Court's decision and judgment with respect to the Japanese commodity tax should be coupled with an order that the order of the Customs Court with respect to the imposition of countervailing duties be modified (1) to become effective the day after the date of publication of its decision in the Customs Bulletin and (2) to provide that assessment of countervailing duties be subject to possible suspension under the provisions of 19 U.S.C. § 1303(d)(2).